Good morning. May it please the court. This case concerns several breaches of fiduciary duty claims against a self-funded ERISA welfare plan. The Department of Labor will primarily discuss the key issues for them concerning the need to hold assets in trust and the need for an independent fiduciary to remedy some of these breaches. In my limited time, I would like to discuss primarily two other key issues, the prohibited transactions by the plan administrator and the underfunding of the plan, of course subject to the court's questions. First of all, the evidence is undisputed that the contract administrator here had sole signatory authority over the plan's operating account with Wells Fargo that contained anywhere from $400,000 to $500,000, consisting of employee contributions from which the administrator unilaterally paid claims and expenses and its own fees. This account was obviously not held in trust because the plan had no trustees, and the administrator had this unilateral authority. There were no invoices to the directors, the executives of the plan. There were no checks signed by the directors of the plan. We have the transaction records which show, and those are at two excerpts to the record, 256 to 269, which show that the administrator had numerous transactions each month, 10 to 18 transactions consisting of anywhere from $43 to $40,000 with no discernible pattern. So I don't think there's any question that the administrator was a fiduciary because they had signature authority over plan assets. And also, I think under 406B of ERISA, their control was not ministerial. They determined the timing and the amounts of the monies that they withdrew from the plan's operating account to pay their own fees. So if we read 1106B in light of our decision in Patelco, it seems like we say, well, it's a flat ban. There's no exceptions because the exception in 1108 only applies to transactions between plan and party in interest. I don't know if that makes sense, but that's what we held, so we're bound by that. So it says, a fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account. So if I understand your position, is that even if all the administrators were doing was withdrawing money that was agreed upon by the plan for their fees, that they're barred from doing that, from going into the assets. So the plan itself could have paid them out of that fund, but they couldn't pay themselves. Is that your position? That's our position, Your Honor, and 406B, I think, provides for that. It says, and the regulations under it also say this is a prophylactic rule that prevents a fiduciary from engaging in a transaction where it has a countervailing interest. So what would be the remedy then? So in Patelco, the fiduciary was on the brink of embezzlement. Here there's no evidence of that. So if the court said, well, they technically violated this rule, they have to pay back their administrative fees, and then what would the remedy be? The plan could then give them their reasonable fees. So is that how it would work? No. Because the plan can certainly pay the expenses. We said that as well in Patelco. The plan can pay expenses. The remedy, Your Honor, is that the breaching fiduciary, the administrator here, would have to disgorge its profits, and that's what the rule says. So were there any profits here? I mean, they had a salary. They had administrative fees that was agreed on by the plan, and according to them at least, they withdrew the amount which they were owed and they reported that to the plan. So they took the money in a manner that I guess they shouldn't have under this 1106B, but so far as we know, they only took their own fees. Well, that's so far as we know. There's never been a claims audit of that operating account, which shows how this. The remedy is you want some sort of evidentiary hearing with an audit and to determine whether they took any more than what they were owed under their agreement. Well, it would be twofold, Your Honor. I believe it would be an audit to see if they took more than they should have and also to determine what their profits were. I think it's pretty clear that they made a profit. They're still in business. They're a for-profit corporation. The key here, I think, as the Briscoe Court found, is that there should have been what's called a zero balance account, and that's what our CPA expert also said, that is the fiduciaries, the trustees, should have exclusive control of the plan assets. When it comes time to pay claims or expenses, there should be an invoice and a check signed by the trustees to fund that operating account. You don't have an operating account where all of the income is under the control of a contract administrator who then can willy-nilly determine, here's what we need this week to pay our fees with no invoice, no calculation of how the fee was determined. And from looking at the transaction ledgers, I don't see how – because if you – The administrative fee issue was argued to the district court, and the district court said the administrative fees to the administrator were not too high. And so far as I know, this issue was not appealed to us. We didn't dispute the reasonableness of the administrator's fees, but the district court found that the contract administrator's service agreement authorized it to pay its own fees from the operating account. Okay, and that's what you're focusing on is for that. That's right. Okay. You were also going to address the failure to maintain the adequate reserves, and I thought the district court did not address that. Is that correct? Not at all, no. Explicitly refused to address the actuarial soundness of the plan, but did find that the plan documents required an annual actuarial review, which had not been done since at least 2005. Well, was the issue of adequate reserves properly raised before the district court? Oh, absolutely. Absolutely, Your Honor. In fact, our expert, an actuary by the name of Mark Cream, submitted a detailed expert report and was deposed to show that the reserves only for the claims already in pay status required about $12.5 million. So what was the reason that the district court declined to rule on that? There was none given. It was just silent. It didn't say, I'm not going to rule on this. It just seems to have missed the issue. Isn't that right? It talks about the actuarial requirement, but doesn't specifically address your failure to maintain adequate reserves argument. There was some colloquy, as I recall, at the summary judgment hearing on it, Your Honor, but no real explanation.  that there are no statutory standards for funding in a welfare plan as opposed to a pension plan. But we're not arguing that some statutory standards should apply. We're saying that as a matter of prudence under ERISA for welfare plans, as a matter of loyalty to the participants, under 402B of ERISA the fiduciaries have an obligation, a duty, to have a funding policy and to monitor that policy to make sure that the assets are sufficient to pay the benefits that they're promising. The fiduciaries here had no real actuarial evaluation at all. That's what their actuary admitted. They simply used the administrator's estimates of how long claims would last. So without determining what the true liabilities are, they couldn't possibly have a funding policy. Furthermore, the bylaws of this plan required a separate reserve for claims expected to last longer than 24 months. And the deposition testimony is undisputed that the fiduciaries ignored that. They had no separate reserve. So both under the plan documents and as a matter of prudence, we believe that they should have had competent actuarial determination of those liabilities. And what they're saying now is that even in their financial statements, they're still touting to the firefighters in this state that they only have liabilities of 1.7 to 1.9 million. Well, how can that be if our actuary did a very comprehensive analysis of those existing claims, said you need $12.5 million? Do you want to say the rest of your time? I do. Thank you very much. Good morning, Your Honors. My name is Marcia Bobb. I represent the Secretary of Labor. With respect to the held in trust requirement of Section 403, the statute requires that assets be held in trust by a designated trustee. I've had so much trouble with this argument. I've been really struggling with it because ERISA doesn't define the word trust, right? It doesn't. Well, it defines the trust instrument is something that's been recognized in American Anglo law for centuries. But the trust instrument is a document. I mean, it seemed to me that I was wondering whether you were faulting the plan instrument, which the statute says as long as the plan instrument creates a trust, whether you were faulting it because it wasn't using the words trust and trustee. I mean, obviously, the plan says it's – and the plan sets it out that the plan and the board is holding the assets that are paid in by the members for their benefit. I mean, it's a classic trust. It doesn't use the word trust. It doesn't use the word trustee. But that's what it says. It's a trust document. It creates a trust. And I couldn't understand the department's argument on that point. The importance of a trust instrument is that it identifies the trustees and that the trustees acknowledge their status as trustees. So is it words that you're saying? You're saying it doesn't say the plan board is trustees and they're holding this trust race in trust. So it doesn't have those words. But wouldn't a court interpret that plan as creating a trust and trust obligations on the plan and the board? Well, trustees are – they are, under Massachusetts Mutual, trustees are the most important. One of the most important functions of ERISA is to identify trustees who acknowledge their fiduciary responsibilities under Title I of ERISA. And aren't they identified in the plan? I mean, that's exactly what the plan says, that they're holding it on behalf of the – it's the trustee of the funds held by the plan. It says the board of directors shall manage the fund and all of its assets on behalf of the beneficiaries. I mean, I can't think of language that would be clearer to create a trust. It doesn't use the word trust. Your Honor. I don't think the courts say you need to use that word. There should have been a trust account established by identified trustees, identified by name. Those trustees should have created a trust account. The Wells Fargo account. Well, can there not be – I mean, ERISA itself doesn't say there has to be established a trust account, does it? The Secretary's implementing regulation requires a written trust account. Okay. And what regulation is that? It's the – it's cited in our brief, Your Honor. It's at 29 CFR 2550, and it's a subpart – it's a 403A-1. And that regulation is an interpretive regulation that's required – that is entitled to Chevron deference as an interpretive regulation. And that says that the trustee of the plan has to create an account using – A written – It wasn't an account? A written instrument, Your Honor. But there was a written instrument here. It was the plan. And the statute says trust instrument or plan instrument. But this could also be a trust instrument. It doesn't use the word trust, but it creates a trust, right? The Secretary does not believe it meets the requirements of Section 403, and the defendants here created a corporate account, the Wells Fargo account. It's not a trust account. It does not designate trustees who have exclusive control over those assets. There's a procedural error, you're saying, that it violates a regulatory requirement as to how an account should be set up. Is that what the claim is? Yes, it does, Your Honor. But it also doesn't give – it doesn't – the signatories to that account are two individuals who are not designated as trustees, and the trust – it does not designate trustees who have exclusive control over plan assets. What difference does it make if it's treated as a trust? It makes a difference because trustees have strict liability under ERISA to comply with their duties of loyalty and their duties of prudence. Those – But you're saying the board of directors have no duties whatsoever. Well, they – Is that right? No. What we're saying is that they – Wouldn't you say if they violated their duties that they have this duty as trustees? That duty would be as a functional fiduciary, not as a trustee. So you're saying that – you're standing here and saying the board of directors are not trustees. They're not trustees. They have no trustee obligations. They're functional fiduciaries. And those two things are very different under law. A functional fiduciary is going to be judged by the control he exercised with respect to a given transaction. So you're saying a person who holds funds of others on their behalf is not a trustee. It's just a functional fiduciary. It's not a trustee. It could be a functional fiduciary. Because the word trustee is not used? Or what other reason would there be? Well, the same reasons that were recognized by the Supreme Court in Massachusetts mutual, which is that a trustee must be designated in a written instrument. And the trustee – There's a written instrument here that gives them that responsibility. But it's not a trust agreement, Your Honor. It doesn't say trust. No, it doesn't. And that's what's crucial? What's crucial is that they acknowledge their status as a trustee so that they acknowledge their fiduciary responsibilities, which are at the core of ERISA. And they have strict liability as trustees to hold plan assets in their exclusive control and that they are not put in a situation where the plan participants have to fight over whether they are functional fiduciaries who had de facto control over a specific transaction. They shouldn't be put in that position. I have only 30 seconds left, Your Honor. I'd like to just point out that there are three reasons why the courts – the court never addressed the 403 argument. The court was wrong for three reasons. One, prudence. The court relied on prudence. Prudence is not a defense to the clear statutory requirement of Section 403. There's no evidence – second, there's no evidence to substantiate that this conversation with the department occurred. And if the – it wouldn't have been prudent to rely on a statement by – a 1987 statement by an unidentified department official of unidentified substance that conflicts with the clear statutory language of 403 and its implementing regulation. Thank you. Thank you. Good morning. May it please the Court. I'm Brendan Begley from Weintraub Chauvin for the defendants. I understand the schedule and how oral arguments were received today. I wonder, though, since I'm crossing town, is it permissible for me to preserve the time and is it my time for the public after Plankton gives his response? I think that is how we're going to do it. Is that right? Is that what we – The schedule was they go on their appeal, then I go on my response to it and then my appeal, and then they get to rebut, but there was no indication that I would get rebuttal time for my cross-appeal. Can you stop the clock while we're trying to figure this out? So you have 20 minutes total, and – I'd be surprised if I used it all, but I'm going to reserve five minutes for another one. Yeah, I think that's fine. Thank you, Your Honor. You know, just for the purposes of levity, I guess, I'm thinking you've got a tax and ERISA calendar, and I feel like, you know, I'm looking across the room, I'm opposing two very capable ERISA attorneys in two different related cases, as well as the Department of Labor. My client and I kind of walked in, it seems, to the cafeteria as freshmen and encountered two very smart sophomores and their older, meaner cousin, and we're getting this up for our lunch money. And I'm here to tell you I'm thankful that we have lunchroom monitors that look at this very closely, Judge Jamerrill and Judge Mueller, and largely came to the right result. Frankly, I probably would not have crossed the field. I definitely would not have crossed the field if there wasn't an appeal. I had a difference of opinion with Judge Jamerrill in this case about some things, but Judge Jamerrill and Judge Mueller, I think, both gave this case very intellectual and serious effort and very – the most thoughtful misdemeanor I've ever asked from a judge. So both very fine jurors, excellent. Not much of an opinion. I want to respond first to Mr. White's observation about there's no self – there's self-dealing in Cassie's – Cassie is the administrator – the self-dealing argument. He cited just recently under 20HA this new case, Hylex, from the different circuits. This case is very telling. It's a very similar situation to ours, where the administrator draws its own previously agreed-upon fees from the bank account that it also pays claims out of. And in that case, the administrator tacked on some additional fees that were not agreed upon, that the plan and its governing body never heard of. And when they found out about it, they sued the administrator. The plan sued the administrator and said, that we never agreed to that you cashed the check. You wrote the check yourself for that. It's self-dealing. Now, you know, the other – I think that was the Eighth Circuit. If the law was, as Mr. White indicates, the Eighth Circuit would have said, you're writing checks for your own administrative fees. End of story. We don't need to figure out if these other fees were pre-agreed upon or not. That's the end of the story. You're writing the check on your own account for your own administrative fees that doesn't allow that. It's self-dealing. End of story. When I clerked here at the Ninth Circuit, every opinion I've read from the Ninth Circuit ever since, all the judges I know try to find the most direct way to find the right result without putting a bunch of dick dig in there. And so it would just be pure addictive for the Eighth Circuit and this Court and Sani v. Patelco to analyze whether or not these things were pre-agreed or whether or not they were extraneous to the agreement. They would have just said, you're writing checks to yourself, that's it. So it's not self-dealing. I want to respond to the argument about underfunding. Why didn't Judge Dantrell rule about this? Judge Dantrell didn't rule about this as Mr. White predicted, I would say, because there's no standard. Larissa has no standard saying here's what your funding has to be in this kind of plan. You have to have this much, you figure it this way and that way. There's just no standard. And so I think Judge Dantrell just said, gee, I'm just not going to put in here that this argument makes no sense because this is a very capable Larissa attorney. He must have meant something by this, you know, underfunding thing. Maybe what he meant was that the actuary didn't do a report in 2007, 2008. So I'm going to construe it as that without just coming out and saying, there's no standard for this funding. So that's why Judge Dantrell didn't analyze that argument, because how was he to analyze that? Well, so I guess the argument is that there's a fiduciary duty to have adequate reserves and there's a genuine issue of material fact as to whether the reserves were adequate or not. Thank you for bringing that up, Your Honor. There are two different reserves that we're talking about here. One was required by the bylaws, and there's no dispute that that was adequate. And that's set by the bylaws. The bylaws say it has to be this much. That was set and that's there. It was a different discretionary fund that the plan directors came up with and they said, let's do this for a while. Let's put aside one year of contributions just for a reserve rainy day fund. And they did that for a little while, and then they said, we don't need to do that anymore. The bylaws don't require it. ERISA doesn't require it. So you have to keep in mind there's two different reserve funds here that we're talking about. There's no dispute. Well, with the one you're talking about now, you're saying that because ERISA doesn't specify any standards, there is no duty for the adequate reserve? There's no measure for an adequate reserve. There's a duty to have it, and if you don't have it, then you'll get sued and they'll say you should have invested this way and that way. You don't have enough money to pay your claims. We've always had enough money to pay our claims. There's never been a dispute about that. But then prudence would come once there's some showing that, oh, gee, you're not able to make your claims. But you can't just go hire your own expert and come in and say, well, my expert thinks that there's a different way to do it and we don't like the way you're doing it. His expert's analysis, I don't want to spend too much time on it, but it's just facially wrong. You know, he says you have to have $12.5 million put aside for 82 claims. Eighty-two claims. Most of these claims, all but eight, are only going to last two years, and they're only going to last one year if the firefighter was hurt on the job. Mr. Barbosa himself had a two-year claim with a one-year offset, $75,000. Mr. Barbosa was at the top of the firefighting organization. We're talking about a battalion chief here. There's not really a way we could make that decision, though, right? That's just based on dispute. That's just math. I'm not asking you to make the decision. So the district court didn't expressly rule. I don't know how we get around that or say it didn't matter, that it was harmless. We don't have anything on that from the district court. Exactly. My point is, ERISA has no standard saying you have to have this much funding. You have an expert witness who comes in and says, it's imprudent because the way you're funding it, you have $12.5 million in outstanding claims. It's just facially wrong. It's wrong. It can't create a genuine issue of material fact because whatever the expert said, there's no way to evaluate it. I guess I'm not understanding your argument. No one would measure it unless I can't play claims. If my plan, all of a sudden, somebody files a claim and we say we don't have any more money to pay claims, well, then he's got a fiduciary breach claim where he sues the trustees and says you didn't manage the plan competently or prudently, and now you each individual trustees are personally on the hook to reimburse the plan for the money that should have been there. That's where that comes in. You can't just deputize any plan participant as kind of a deputy attorney general to come in and say, I'm going to hire an expert and pay him to say whatever I like, and I'm going to have him say that your plan is underfunded, even though there's no statutory standard for what that funding should be. So you're saying that no participant could raise the argument that the plan was breaching its fiduciary duty by not having adequate reserves until the plan stopped paying claims. Is that what you're saying? At least until the plan stops paying claims. So the plan has to be bankrupt before you can go in and claim that they had inadequate reserves? If it's not bankrupt, there's no purpose to it. If there were, Congress would have said you have to have this much money set aside. Congress didn't do that. Is there a case that supports that? It's the absence of a case that's important. There's no case that says that he can do what he's doing here, that he can go hire a private, independent expert witness, and we all know what expert witnesses are, and come in and say, I don't think you have enough money, and now all of a sudden force us to spend money litigating it. ERISA's purpose is to help us preserve those funds to pay disabled firefighters, not to pay attorneys like me to come in and oppose some self-serving expert witness who says, I don't think you have enough there, even though you've always been able to pay your claims since 1988. You know, this argument was made, you have to remember, back in 2011. The sky was falling then. We're still here. They're still paying me to come in here and talk. No evidence of us being unable to pay a claim even if there were, you'd have gotten a judicial notice of it. So there's just no standard. Judge M. Rowe is right not to go on that, because there's just no standard for him to measure it by. So it's a prudent standard, but, you know, in order for that prudence to have been derelict, there has to be some kind of damage to the plan. You know, he's got an expert witness who says $12.5 million short funding, but the math is wrong. The math is just basically wrong. Eighty-two claims outstanding. Only eight of them are going to go more than two years. The rest of them are only going to be a two-year benefit. Most of the time, it's only going to be one, because there's the offset for the $48.50 pay. You're talking about a one-year benefit for 70 people. It's going to be about $35,000 each. And again, there's $12.5 million. The math is just basically wrong. I want to talk about, unless you have further questions about that, assets held in trust. The assets are held in trust. They're not held in a trust. I've briefed extensively why I don't think the Department of Labor is entitled to deference. I don't feel the need to go into that here unless you have questions about it. But, again, I want to take you to the Hylex case. The opposing counsel brought to your attention last week under 28A. Hylex was just like our case. Just like our case. Administrator is paying his own funds out of there. And, you know, the reason I bring that case up is because there's an unforeseen kind of trapdoor here. If you were to hold in this case that we're not holding assets in trust, sorry, I need to back up. In Hylex, the administrator said we're not a fiduciary. And part of the reason is because there's no trust document. There's no trust document. We're holding onto this money and paying claims out of it and paying our And the Eighth Circuit said, well, you know, you're holding that in trust under common law. If you were to agree with the Department of Labor today and say, gee, when you do this, you're not holding assets in trust, you're sending a case out there that now says any time an administrator comes in and says, I am self-dealing, I'm taking this money out of here that wasn't pre-agreed, and guess what? There's no formal trust. So this stuff isn't held in trust, so I'm not a fiduciary. I mean, that would be a disaster. That can't be. And you're agreeing that there'd be individual liability if there were damage for not having adequate reserves under the estimate you have. The rest is very clear on that. Oh, yeah. Not if they didn't have adequate reserves. There's no standard for whether or not those reserves are adequate. I don't mean for not having adequate reserves. I mean if there, in fact, turns out to be no adequate reserve and there's damage because of it, you agree that the individuals would have individual liability, even though they're not called trustees? They're fiduciaries, fiduciary trustees. They're on the hook for any fiduciary breach that they make. If they are not prudent in how they manage the plan, they're going to be on the hook. Absolutely. I had a couple issues here regarding the summary annual review. The opposing counsel didn't talk about the 990. I think that's pretty well briefed. I don't feel the need to discuss that. Is that issue still in play, or is that now moot because the plan has started filing the Form 990? There's judicial notice motions competing about this. I don't think there's enough in those judicial notices to infer the plan has been filing 990. So the judicial notice was aimed at whether the fund had ever been put on the risk of losing its tax-exempt status. And so the question is, well, is the plan now filing the Form 990? So maybe you're not the right person to ask. I'll save that for the plan. That's the accountants that do that, not me. It's my understanding that they probably did. So then is that moot, then, if they're now filing the Form 990? Because you didn't allege that there were any damages by their failure to file. So is that issue still correctly before us? I think opposing counsel would argue that it is because he wants injunctive relief to say you always have to file 990 going into the future because you didn't do it before. And I'm just guessing he would probably say, you know, he'd argue the doctrine of capable of repetition but evading review because he didn't file it in the past. But I think it's a fair point that it may well be moot since they did file. I hadn't thought about that before because I didn't see a mootness argument raised by opposing counsel. So if that's something that you'd like to hear more about, I'm just kind of shooting from the hip here. I'd be happy to file a letter brief or something like that in the next week. That might be helpful on whether the issue is moot. Very well. Shall we say a two-page letter brief? All right. We'll send out an order on that. Judge, I had one question I wanted to be clear about. What is the annual take of the corporation from the contributions? What percentage of the annual contributions are taken as expenses? If I may, Judge Noonan, to explain, my client is a little unusual in that their fee, if you will, the administrator's fee is based on the number of participants in the plan. And I believe it's currently $3.75 per month per participant. The administrator pays its own expenses out of that. It doesn't charge additional expenses, which is why there's no invoices. There's no need for invoices because everybody knows how many members we have. And it's $3.75 per month per person. You get a quarterly statement from the accountant saying here's what it is. And it's just simple arithmetic. I have the figure that you take 24%. Is that true? No, I don't believe that's true, Your Honor. I think the monthly premium is about $20 a month. And they're only charging $3.75 per month per participant. So, no, it's not that high. Counsel had made an argument and it's, I'm sorry, pled that the ratio was wrong and actually tried to support that in the Rule 11 opposition. But said that, you know, it looked like it was kind of high. But then when we figured out how big the plan was, it was like 5% or 6%, I thought. Well, is that your position that it's only 5% or 6%? I'm sorry, Your Honor, I didn't quite hear your question. Your answer is no more than 6%. Is that your answer? I'd have to look at the record, but that's my recollection. Well, do you want to look at the record? I don't have it here in front of me, Your Honor. I could include it in a letter brief if you like. I could answer that question as well. Is that before us? Was that on appeal, the administrative expenses? No. I thought opposing counsel said no. My only understanding of why that issue, and I see I'm just about out of time, so I want to reserve my five minutes. My only understanding of the issue about the percentage of the administrative fees was that opposing counsel and opposing my Rule 11 motion for sanctions said I initially thought that there was all these bad things and self-dealing and kickbacks going on because it looked like the ratio between administrative fees and contributions was high by comparison to other plans. Other plans were like less than 3%, and we were like 6%. I don't have the exact figures, but I don't remember it being 25% anywhere near there. And he said, but then when he got evidence, he decided that, all right, it looks like given the size of the plan and the extra things that these administrators do, that's not that out of whack. So I don't believe there's a real issue about whether or not the administrative fees-to-contributions ratio is problematic. Do you want to save the rest of your time? I would like that very much, Your Honor. Thank you. Your Honor, I'd like to address several of the points. First, with regard to the Court's questions regarding the trust, it's certainly true that a plan can act as a trust, and a trust may use the word trust and not be one. The difference here is in the way the assets are held. Here, the assets are held in the name of a corporation. A trust, on the other hand, the assets are held in the name of a trustee, and that's one of the factors that the Department of Labor relies on in saying that trust assets must be in the exclusive control of trustees rather than the corporation. Here, of course, the plan administrator has substantial control. The other thing, and I've discussed this in my reply brief at page 25, the bylaws of this corporation were designed to indemnify and exculpate these directors from many of the duties that are imposed by ERISA on trustees. So the corporate form was chosen not to act as a trust but to minimize their own liability. Well, so a bank can be a trustee. I mean, frequently the Wells Fargo Bank is a trustee, and their directors and whatever are protected by the Wells Fargo, and they can function as a trustee, and here I thought everything the administrator did was under the supervision of the plan, under the board. That's what it says in the plan document. So I guess I'm having trouble to see what the distinction is. It was a corporation, just like a bank is a corporation, acting as a trustee. A bank usually has a trust department, and a bank, in my experience, when it acts as a trustee, has a co-trustee agreement that spells out those duties and obligations. Isn't that what the plan instrument was here? No. No, and I've tried to explain that in the reply brief. They did not have exclusive control of the assets. Well, they allowed their administrator to have signing authority under their supervision. So are you saying that's a violation of regulation? Absolutely. And that's the regulation that the Department of Labor cited? Well, and the statute itself requires that the trustees have exclusive control, and if the corporation holds the assets, there is no designated officer that actually holds those assets in trust. So that's a violation of the trust agreement. Your time's expired, so could you just wrap up? Yes, I'll just limit myself to the funding issue. Opposing counsel has argued with the actuary that we independently engaged. He's certainly not qualified. The fact is that there was no contrary evidence to what our actuary testified about in the reserves needed for this plan. And as far as the 990, the evidence is clear that they did file the 990. They've been evasive about the fact that they did. They won't commit to continuing to file it. In fact, they hide the fact that their tax exempt status was taken away for not filing it. So I think we need an order from this court to make sure that they continue to make that financial information publicly available to these firemen. Just a couple of very brief comments. First, it's not right to say that we have not appointed a fiduciary, a trustee. You can use that word, fiduciary, it's the word I would use to handle the funds. The funds in the Wells Fargo account are paid. It is an individual, two officers, two CASE officers in the signing authority, but when you sign a check, as you all know, you don't sign the Ninth Circuit. Kathy Katterson signs the checks. It doesn't say the Ninth Circuit.  Those two officers are part of an administrative that is unquestionably a fiduciary, and the record shows that they were appointed in the documents by the plan to do that. So the plan did appoint a trustee, a fiduciary, however you want to say it, to govern them. Two other really fast points I want to make about the underfunding. The Department of Labor is here today. The Department of Labor has been heard on amicus briefs, and it's very telling to me that the Department of Labor has not said, your plan is underfunded and here's why, and here's the standard for that. If there was such a standard, such a case, such an authority that says that you can maintain a lawsuit, I'd like to think, number one, the Department of Labor would have told us, and I'd like to think, number two, the Department of Labor would bring its own enforcement action, which it's capable of doing. What do you say about the argument that there was no contrary evidence to what they presented? Our actuary, I believe, said that he thought that there was enough in there. Contrary evidence, we did object to it, and I did point out at the trial court, I shouldn't say I, but my firm pointed out that, you know, his numbers are facially wrong. You know, we've paid 1,300 claims since 1987, and that hasn't even added up to the $12.5 million, I think, that he says we need to have aside for 82 open claims, of which he says eight, only eight are going to go more than two years, and he can't tell how many of them are only going to be one year. And the maximum value of these claims is like, I don't know, it's got to be less than $20,000 for each one. The last thing I want to say about the Department of Labor is that, you know, self-dealing is a very serious allegation. Saying that somebody's self-dealing is taking this money out of me brings to mind Jimmy Hoffman. And, you know, here again, the Department of Labor, although it's here and it's been very enthusiastic in supporting Mr. Barbosa's claims, has not jumped in and said, yeah, there's self-dealing going on, that's wrong. One would hope that if there was that kind of self-dealing going on and it was illegal, the Department of Labor would be the first at the door to slap the handcuffs on my client, and if not then, at least jump in here at the benefits and say, yeah, that's self-dealing, I think it's very telling. Unless there's any questions, I would just say, I think I'd brief the Rule 11, the Summary Annual Reports, and the Actuarial Review Issues, and I don't see any need to talk about that. Okay. Thank you for your argument. The case of David Barbosa v. California Association of Professional Firefighters in 11-15472 is submitted.
judges: Albritton, Noonan, Ikuta